CALVIN, RESPONDENT, *v.* CUSTER COUNTY ET AL., APPELLANTS.

(No. 8,115.)

(Submitted October 14, 1940. Decided November 1, 1940.)

[107 Pac. (2d) 134.]

*Mr. Harrison J. Freebourn,* Attorney General, *Mr. Enor K. Matson,* Assistant Attorney General, *Mr. I. W. Choate,* County Attorney of Custer County, and *Mr. Ralph J. Anderson,* Counsel for the State Board of Equalization, for Appellants, submitted an original and a reply brief; *Mr. Anderson* argued the cause orally.

*Mr. W. B. Leavitt,* for Respondent, submitted a brief, and argued the cause orally.

MR. JUSTICE ANGSTMAN delivered the opinion of the court.

This action was brought to recover taxes on real property paid under protest. Judgment on the pleadings was entered in favor of plaintiff, and defendants appealed. The facts submitted in the pleadings are these:

Plaintiff on and prior to April 28, 1938, was the owner of certain land in Custer county. On that day he granted to the United States a written option to purchase the land for the sum of $53,185.37, which contained this clause: "To accept this option, the United States shall within six (6) months from the date hereof mail or telegraph a notice of acceptance to Carl B. Calvin in the city of Miles City, State of Montana, and the United States shall thereafter have a reasonable time within which to examine the abstract of title to be furnished by the vendor as hereinafter provided." The written option provided that if the United States determines the title to be unsatisfactory, it

might acquire title by condemnation, Calvin agreeing to accept the above sum as the amount to be paid for all damages sustained by reason of the taking. It provided that the United States, after accepting the option, should have the right of possession "for the purpose of clearing, plowing, planting, constructing, and maintaining such permanent or temporary structures and improvements, and to do all other things necessary or desirable for or incidental to development of the land as a part of the project area; that in the event title to such land does not become vested in the United States, it shall have the right to enter upon and remove any or all equipment, appliances, materials, structures, fixtures, and other property whatever placed by it upon said land; and the vendor waives all claims for damages arising from the activity or inactivity of the United States in the exercise of any or all of said rights."

Plaintiff agreed to deliver at his expense an abstract of title to the property which was to become the property of the United States "upon the consummation of the contemplated purchase but otherwise shall remain the property of and be returned to" plaintiff. The United States was authorized to pay the taxes and deduct the same from the purchase price. In the event of damage to the property by fire, the loss was that of plaintiff, and the United States had the right to refuse to accept conveyance of title, or it might elect to accept conveyance subject to an equitable adjustment of the purchase price. Plaintiff was not to receive the purchase price until title was approved by a duly authorized representative of the United States.

On June 17, 1938, the United States accepted the option and entered into possession and made extensive improvements, all prior to the first Monday in March, 1939. After the United States took possession plaintiff was not permitted to use the land or receive any benefit therefrom. After the acceptance of the option by the United States plaintiff was required to clear up certain irregularities in the chain of title to certain parcels of the land. The formal deed to the United States was executed and delivered on November 15, 1939.

Defendants assessed the land for the year 1939, the tax being $474.76, which was paid before delinquency by a representative of the United States under protest. The United States assigned to plaintiff its claim to recover the tax. The question for determination is whether the land was taxable for the year 1939.

Under section 2, Article XII of our Constitution, "the property of the United States  *  *  *  shall be exempt from taxation." Plaintiff contends that the property in question became that of the United States upon the acceptance of the option of June 17, 1938, and hence that it was not taxable for the year 1939. Defendants contend that it did not become property of the United States until the execution and delivery of the deed of conveyance on November 15, 1939, and therefore that it was taxable for the year 1939.

It should first be noted that while the writing in question here was called an "exclusive and irrevocable option and right to purchase," yet it is clear from its terms as a whole that after its acceptance by the United States it became a contract of sale and purchase. In other words, by the word "accept" as used in the contract, the parties evidently meant the same as "exercising" the option. There are many provisions of the contract that lead to this result. One paragraph which points to this conclusion is the one reading as follows: "In consideration of the foregoing, the United States agrees upon acceptance of this option, to acquire the land herein described at the consideration set forth, if the land may be so acquired in accordance with the terms of this option, and further agrees, after the execution, delivery, and recordation [of] the said deed or deeds vesting title in the United States, the approval of title by a duly authorized representative of the United States, and the signing of the regular Government voucher or vouchers therefor, to cause final settlement to be made by the issuance of a United States Treasury check."

Under our statute taxes become a lien upon property on the first Monday of March in each year (sec. 2154, Rev. Codes 1935), and under section 2002, as amended by Chapter

72, Laws of 1937, property must be assessed to the persons by whom it is owned or claimed, or in whose possession or control it was at 12 o'clock M. of the first Monday in March. In effect the law contemplates that the property shall be taxed in the name of its owner. The question then resolves itself into this: Who was the owner of the property on the first Monday in March, 1939?

It is conceded, of course, that the legal title was in plaintiff. The trial court, however, found that the equitable title or estate was in the United States and, that being the case, found that the property was exempt from taxation. The court was correct in its conclusion.

In the case of *Town of Cascade* v. *County of Cascade,* 75 Mont. ▋▋▋▋ 304, 243 Pac. 806, 808, it was said: "It is the situation or character of the beneficial owner, the holder of the equitable title or estate, and not that of the holder of the legal title, which determines the question of exemption from taxation under our constitutional provisions and those of like import."

In *Kern* v. *Robertson,* 92 Mont. 283, 12 Pac. (2d) 565, 567, we said: "The authorities are in accord that an enforceable contract for the purchase and sale of real property passes to the purchaser the equitable and beneficial ownership thereof, leaving only the naked legal title in the seller, as trustee for the purchaser, and as security for the unpaid purchase price."

The rule is stated in 13 C. J. 855, as follows: "A contract for the sale of land works a conversion, equity treating the vendor as holding the land in trust for the purchaser, and the purchaser as a trustee of the purchase price for the vendor. The vendor's interest thereafter in equity is in the unpaid purchase price, and is treated as personalty, while the purchaser's interest is in the land and is treated as realty." To the same effect is 18 C. J. S., Conversion, section 9, page 48, and 19 American Jurisprudence—Equitable Conversion—section 11. In order for this principle of equitable conversion to apply, however, there must be a binding contract (66 C. J. 703), and such as a court of equity will specifically enforce against an unwilling purchaser. (13 C. J. 855; 3 Pom. Eq. Jur., 4th ed., sec. 1161.)

Defendants contend that the United States could not have been compelled to accept the title if it was not satisfactory. However, the rule is that if there are no reasonable objections to the title, or if the title were such that a reasonable man should be satisfied with it, the purchaser will not be permitted to defend on the ground that he is dissatisfied with the title. In *Ogg* v. *Herman*, 71 Mont. 10, 227 Pac. 476, 477, this court said: "In our judgment common sense dictates the rule that a title satisfactory to the purchaser means a title to which there is no reasonable objection—such a title as a reasonable man should have been satisfied with; and, if the title is good and valid without reference to extrinsic evidence, the purchaser, as a reasonable man, should be satisfied with it, and should not be permitted to say that he is dissatisfied and thus avoid the contract, because, perchance, he has become tired of his bargain." The same principle was announced in 57 A. L. R. 1253–1320 and 1321, as follows: "But the better rule seems to be that under such a contract, the approval of the attorney is not a condition precedent to the right of the vendor to enforce the contract; it is sufficient if the vendor shows that the attorney acted unreasonably, which fact is established if it is shown that the title is marketable."

Here the plaintiff not only was able to, but actually did present to the United States a satisfactory title. The subsequent exhibition of the vendor's title relates back to the date of the execution of the contract. (Pomeroy's Specific Performance of Contracts, 3d ed., sec. 317.)

But defendants contend that the United States cannot be sued without its consent and for that reason the plaintiff here could not have enforced specific performance of the contract. We think that circumstance does not alter the rule under the facts here involved. The United States, as before stated, took possession of the property and received the beneficial use thereof after accepting the option, and plaintiff was deprived of all benefits in the property after that time. We think that in determining in whom the equitable interest vested we must treat the United States as if it were a private person or cor-

poration, amenable to suit. And in determining whether the contract was enforceable against the United States we must look to its terms and not to the circumstance that the United States cannot be sued for the enforcement of such a contract, if such be the case. The contract was fully carried out by the United States as well as by plaintiff. There is respectable authority holding that under such circumstances the equitable conversion took place as of the date of the contract, or here as of the date the option was accepted. In *Newport Waterworks* v. *Sisson,* 18 R. I. 411, 28 Atl. 336, the court in speaking of this said: "When the title is given, it relates back to the date of the contract, the vendor and his heirs or devisees holding the legal title meanwhile as trustees for the purchaser. This result rests upon the familiar principle that equity regards that as done which is agreed to be done."

In section 1161 of Pomeroy's Equity Jurisprudence, fourth edition, it is said: "The fact that the contract of purchase is entirely at the option of the purchaser does not prevent its working a conversion, if he avails himself of the option." And in section 1163 the same author states: "In contracts of sale with the purchaser's option, the question whether or not a conversion is effected at all cannot, of course, be determined until the purchaser exercises his option; but the moment when he does exercise it, the conversion, as between the parties claiming title under the vendor, relates back to the time of the execution of the contract." Here, as above stated, the option was exercised by the United States and the purchase was fully consummated. The conversion relates back, if not to April 28, 1938, certainly to the time when the binding contract was accepted by the United States, viz., to the 17th day of June, 1938.

Defendants rely upon the case of *Gloster Lumber Co.* v. *Adams County,* 173 Miss. 865, 163 So. 541, but that case is not applicable here because in that state all property is assessable as of the first day of January. The option in question was not given until January 2, and was not accepted until January 11 of the year in question, and for those reasons is clearly distinguishable from the facts in this case.

The defendants also rely upon the case of *Southern Forest Land Co.* v. *Amite County,* 176 Miss. 130, 168 So. 286, but that case seems to be at variance with the general rule followed by this court in *Ogg* v. *Herman,* supra. They also rely upon the case of *Jones* v. *Morse Bros. Lumber Co.,* 171 Ga. 753, 156 S. E. 587. That case is distinguishable in that there the vendors, and not the vendees, had the right to the possession of the land and to the use thereof during the period in question. They also rely upon the case of *Bemis Hardwood Lumber Co.* v. *Graham County,* 214 N. C. 167, 198 S. E. 843. In that case, however, the government had to resort to condemnation proceedings to secure title to the land. The title finally acquired could not relate back to the contract.

Defendants also rely upon certain language used in the case of *Valley County* v. *Thomas,* 109 Mont. 345, 97 Pac. (2d) 345. That case is not controlling here, for in that case premature possession alone by the government was relied upon to show a purchase within the meaning of section 8, clause 17, Article I of the United States Constitution, where there had been no election to purchase. Here there was a specific agreement on the part of the government to make the purchase.

It follows, therefore, that since the United States was the equitable owner of the property on the first Monday of March, 1939, it was not taxable for that year, and the district court properly held that plaintiff was entitled to recover the taxes paid under protest. The judgment is affirmed.

MR. CHIEF JUSTICE JOHNSON and ASSOCIATE JUSTICES MORRIS, ERICKSON and ARNOLD concur.

Rehearing denied November 28, 1940.